**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DAMON TURNEY, Derivatively on Behalf of STERICYCLE, INC. | Civil Action No.: |
| Plaintiff, | |
| v. | |
| MARK C. MILLER, JACK W. SCHULER, CHARLES A. ALUTTO, JOSEPH BRENT ARNOLD, FRANK J.M. TEN BRINK, LYNN DORSEY BLEIL, THOMAS D. BROWN, THOMAS F. CHEN, RODNEY F. DAMMEYER, DANIEL V. GINNETTI, WILLIAM K. HALL, RICHARD T. KOGLER, JOHN PATIENCE, JONATHAN T. LORD, RONALD G. SPAETH, and MIKE S. ZAFIROVSKI | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| STERICYCLE, INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1.      Plaintiff Damon Turney ("Plaintiff"), by and through her undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Stericycle Inc. ("Stericycle" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from February 7, 2013 to the present (the "Relevant Period").

## NATURE OF THE ACTION

2.      According to its public filings, Stericycle was formed in 1989 in Lake Forest, Illinois to provide medical waste disposal services, hauling away and disposing of medical waste that could cause infectious disease – needles, syringes, gloves, medical supplies and blood products – as well as expired and recalled pharmaceuticals, which are generated in an institutional setting such as a hospital or prison.

3.      Stericycle is a multinational business-to business services company that works with customers to ensure regulatory compliance, minimize environmental impact, manage business and personal risk, improve safety, and facilitate communication.  Stericycle operates in 21 countries and its worldwide network includes 253 processing facilities, 358 transfer sites, and 137 other service facilities. Stericycle's business generates substantial revenues – in 2012, it posted $1.9 billion in revenue – and it has shown significant revenue growth for many consecutive years.

4.      However, Stericycle generated this substantial revenue and achieved its steady growth by programming its internal billing and accounting software to charge an 18% price increase in the flat rates it agreed to charge its customers, which the software imposed automatically every 6 to 12 months since at least 2003. This "automated price increase," or "API", was never disclosed to the customers who paid it, and is not permitted by the customers' contracts with Stericycle.

5.      On February 1, 2016, a federal district court judge approved a settlement between the Company and 14 states and the District of Columbia to resolve allegations that the Company, since 2002, illegally overcharged various government units by adding fraudulent surcharges of up to 18% every 9 months not authorized in government contracts and that Stericycle officials

misled the government units about the nature of these surcharges to receive larger payments than were due (the "Government Action"). The Company agreed to pay $28.5 million, in addition to the $2.4 million the Company already paid the State of New York, despite its insistence throughout the Relevant Period that the lawsuits had no merit.

6.     On October 26, 2016, the U.S. District Court for the Northern District of Illinois granted preliminary approval for a settlement between the Company and a nationwide class of Stericycle's customers (the "Class Action").  The Class Action settlement resolved allegations for more than 246,000 dentists, veterinarians, and other small business owners across the country, who reported escalating fees, as much as 18% twice per year, that were not explicitly stated in their original contracts and contracts that automatically renewed with only a small window to cancel before it renewed for several more years.  The Company agreed to pay $295 million despite its insistence throughout the Relevant Period that the lawsuits had no merit.

7.     While these suits were pending, the Defendants continued to breach their fiduciary duties to the Company and its shareholders by causing the Company to: (1) unilaterally and without notice deliberately increase the billing rates of small-quantity ("SQ") customers and in violation of the service contracts entered into between the Company and these customers; (2) violate customer contracts; (3) provide unsatisfactory customer service and subject customers to abusive business practices; (4) due to unsatisfactory customer service experience, significantly lessen the useful life of customer relationships; and (5) due to its billing practices of SQ customers, generate the artificially high gross margins the Company claimed to have achieved throughout the Relevant Period.

8.     Additionally, while these suits were pending, the Defendants continued to breach their fiduciary duties to the Company and its shareholders by causing the Company to issue false

and misleading statements and omissions regarding its business, operational, and compliance policies.

9.     Specifically, the Defendants caused the Company to issue false and/or misleading statements, which failed to disclose that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in its public filings but, in fact, was subjecting customers to abusive business practices; (4) the Company's customer service practices significantly lessened the useful life of customer relationships; (5) the Company's billing practices of SQ customers were the generator of gross margins the Company claimed to have achieved throughout the Relevant Period; (6) as a result, Stericycle's financial statements during the Relevant Period were materially false and misleading; and (7) the Defendants' statements about Stericycle's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis during the Relevant Period.

10.     On October 22, 2015, the truth about the Company's practice began to be revealed, and the price of Stericycle's stock dropped the next day from $149.04 per share to $120.31, a decline of over 19%.  Moreover, the trading price of Stericycle's depositary shares fell from $106.34 per share to $92.56.  Nonetheless, the Defendants failed to disclose the true extent of the Company's poor performance and the underlying reasons thereof.  By July 28, 2016, the truth about Stericycle's fraud was revealed, and the Company's stock price fell further from $105.93 per share to $90.27, a decline of 14.8%.  Moreover, the trading price of Stericycle's depositary shares fell from $84.2 per share to $74.59.

11.     During the Relevant Period, while the Defendants made and caused the Company to make the foregoing false and misleading statements of material fact, the majority of them engaged in lucrative sales of the Company stock at artificially inflated prices on material non-public information and caused the Company to make repurchases of Company stock at artificially inflated prices.  The Company paid $130.6 million to repurchase Company stock in 2015 for over $130 per share, $194.1 million to repurchase Company stock in 2014 for over $110 per share, and $163.7 million to repurchase Company stock in 2013 for on average about $110 per share. Thus from 2013 through 2015, the Defendants caused the Company to repurchase its own stock, paying over $100 million more than the Company stock was actually worth.

12.     Accordingly, as a result of defendants' reckless breaches of fiduciary duty and other misconduct, the Company has been substantially damaged.

13.     In light of these events described herein, and in accordance with Delaware law, on October 14, 2016, Plaintiff send a written litigation demand (the "Demand") to Mark C. Miller ("Miller"), Stericycle's current Chairman of the Board, demanding that Stericycle's Board investigate and take legal action against those responsible for the damages the Company has suffered and is certain to suffer.

14.     On February 23, 2017, Plaintiff received correspondence from the Company's counsel, Latham and Watkins ("LW") acknowledging receipt of the Demand (the "February 23 Letter"). The February 23 Letter also stated that the Company had retained Foley and Lardner LLP ("Foley"), as independent counsel to assist with investigations concerning the Demand. A true and correct copy of the February 23 Letter is attached hereto as Exhibit A.

15.     On April 4, 2018, Plaintiff received correspondence from Bryan B. House

("House"), representing Foley, regarding the outcome of the investigation conducted concerning the Demand (the "Refusal"). Therein, Foley informed Plaintiff of the following:

> After an extensive inquiry, the Committee has completed its review of the matters raised in the Demand Letter and reported its findings and recommendations to the Board. As described below, based on the Committee's work, the Board has accepted the Committee's recommendation and unanimously resolved that it is not in the Company's best interests to commence a civil action against any of the Company's current or former officers, directors, or employees as demanded in the Demand Letter.

A true and correct copy of the Refusal is attached hereto as Exhibit B.

16.     The Refusal is most notable for what it omits rather than what it contains. The Refusal details the rationale for refusing the Demand – including the potential costs of litigation and the obligations to advance defense costs for the defendants during the litigation, the potential distraction to management, negative publicity, and the impact on employee morale and customer relationships.

17.     However, the Refusal cannot reconcile these concerns with the settlements in the Government Action and Class Action, totaling over $300 million – ***a full one third of the Company's reported quarterly revenue for the first quarter of 2018*** – which the Refusal conveniently fails to identify, despite their apparent concern of litigation costs.

18.     In light of the foregoing, the Board's refusal is improper, demonstrating the Board's lack of good faith, and confirming that Plaintiff should be allowed to proceed and to prosecute this action derivatively on behalf of the Company.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this present action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental

jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

20. Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District. One or more of the defendants either resides in or maintains executive offices in this District, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this District.

## THE PARTIES

21. Plaintiff Turney is a current shareholder of Stericycle common stock and has continuously held Stericycle common stock since January 2013. Plaintiff is a citizen of New York.

22. Nominal defendant Stericycle is a Delaware that specialized in the collection and disposal of regulated waste. Stericycle is headquartered in Illinois and its registered agent/office is located in Cook County, Illinois. Stericycle's common stock and depositary shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "SRCL" and "SRCLP" respectively.

23. Defendant Charles A. Alutto ("Alutto") has served as president and chief executive officer ("CEO") since January 2013 and as a director since November 2012. . Upon information and belief, Defendant Alutto is a citizen of Illinois.

24. Defendant Frank J.M. ten Brink ("ten Brink") has served as Senior Vice President of Mergers and Acquisitions at Stericycle since August 1, 2014. Prior to August 2014,

Defendant ten Brink served as executive vice president, chief financial officer ("CFO") and chief administrative officer of Stericycle from June 1997 until September 30, 2014. Upon information and belief, Defendant ten Brink is a citizen of Michigan.

25.    Defendant Daniel V. Ginnetti ("Ginnetti") has served as Stericycle's CFO since August 1, 2014. Upon information and belief, Defendant Ginnetti is a citizen of Illinois.

26.    Defendant Mark C. Miller ("Miller") has served as the Company's CEO from May 1992 to January 2013. Upon information and belief, Defendant Miller is a citizen of Illinois.

27.    Defendant Jack W. Schuler ("Schuler") has served as Lead Director of the Board since August 2008.  Defendant Schuler also served as Chairman of the Board from January 1990 until becoming named Lead Director. Upon information and belief, Defendant Schuler is a citizen of Illinois.

28.    Defendant Thomas D. Brown ("Brown") has served as a director since May 2008. Defendant Brown is a member of the Compensation and Nominating and Governance Committees of the Board. Upon information and belief, Defendant Brown is a citizen of Illinois.

29.    Defendant Rodney F. Dammeyer ("Dammeyer") has served as a director of Stericycle since January 1998. Defendant Dammeyer is Chairman of the Audit Committee. Upon information and belief, Defendant Dammeyer is a citizen of California.

30.    Defendant William K. Hall ("Hall") has served as a director on the Board since August 2006. Defendant Hall is Chairman of the Compensation Committee. Upon information and belief, Defendant Hall is a citizen of Illinois.

31.    Defendant Jonathan T. Lord ("Lord") served as a director of the Stericycle Board from August 2004 to May 2014. Upon information and belief, Defendant Lord is a citizen of Florida.

32.     Defendant John Patience ("Patience") has served as a director on the Stericycle Board since the Company's incorporation in March 1989. Defendant Patience serves on the Audit Committee. Upon information and belief, Defendant Patience is a citizen of Illinois.

33.     Defendant Mike S. Zafirovski ("Zafirovski") has served as a Stericycle director since November 2012. Defendant Zafirovski is a member of the Compensation and Nominating and Governance Committees of the Board. Upon information and belief, Defendant Zafirovski is a citizen of Illinois.

34.     Defendant Lynn Dorsey Bleil ("Bleil") has served as a director of the Company since her election to the Board in May 2015. Defendant Bleil serves on the Audit Committee and is the Chair of the Nominating and Governance Committee. Upon information and belief, Defendant Bleil is a citizen of Utah.

35.     Defendant Thomas F. Chen ("Chen") has served as a director of the Company since May 2014. Defendant Chen is a member of the Audit and Nominating and Governance Committees of the Board. Upon information and belief, Defendant Chen is a citizen of Illinois.

36.     Defendant Richard T. Kogler ("Kogler") served as Stericycle's chief operating officer, ("COO") from 1999 until January 1, 2015. Upon information and belief, Defendant Kogler is a citizen of Arizona.

37.     Defendant Joseph Brent Arnold ("Arnold") has served as Stericycle's Executive Vice President and COO since January 1, 2015. Upon information and belief, Defendant Arnold is a citizen of Illinois.

38.     Defendant Ronald G. Spaeth ("Spaeth") served as a director of the Company from May 2008 until May 2014.  Upon information and belief Defendant Spaeth is a citizen of Illinois.

39.     Collectively, defendants Alutto, ten Brink, Ginnetti, Miller, Schuler, Brown,

Dammeyer, Hall, Lord, Patience, Spaeth, Zafirovski, Bleil, Chen, Kogler, and Arnold shall be referred to herein as the "Defendants."

40. Collectively, defendants Alutto, ten Brink, Ginnetti, Miller, Schuler, Dammeyer, Hall, Lord, Patience, Spaeth, Kogler, and Arnold shall be referred to herein as the "Insider Selling Defendants".

## DEFENDANTS' DUTIES

41. By reason of their positions as officers, directors, and/or fiduciaries of Stericycle and because of their ability to control the business and corporate affairs of Stericycle, the Defendants owed Stericycle and its shareholders fiduciary obligations of good faith, loyalty, due care, and candor, and were and are required to use their utmost ability to control and manage Stericycle in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Stericycle and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Stericycle and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

42. Defendants, because of their positions of control and authority as directors and/or officers of Stericycle, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Stericycle, each of the Defendants had knowledge of material non-public information regarding the Company.

43. To discharge their duties, the officers and directors of Stericycle were required to

exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Stericycle were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Illinois, and the United States;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Stericycle conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Stericycle and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Stericycle's operations would comply with all laws and Stericycle's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the     Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above; and

(i) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

33.     At all times relevant hereto, the Defendants were the agents of each other and of Stericycle and were at all times acting within the course and scope of such agency.

34.     Because of their advisory, executive, managerial, and directorial positions with Stericycle, each of the Defendants had access to material adverse, non-public information about the Company.

35.     The Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Stericycle.

## SUBSTANTIVE ALLEGATIONS

### A.     <u>Company Background</u>

44.     As of the first quarter of 2016, the Company derives 63% of its revenues from SQ customers.  SQ customers are generally small businesses, including those in the medical and industrial fields that generate low volumes of regulated wastes for disposal.  The Company's domestic SQ business enjoys a higher gross margin and is vastly more profitable than the large quantity ("LQ") business.  Accordingly, the Company has focused its growth strategy on cultivating SQ customers.

45.     The Company's SQ customers have a standard service agreement with Stericycle that provides for the payment of a fixed subscription fee in exchange for the collection and disposal of their regulated waste for periods ranging from one to five years.  Each of these contracts had a standard provision that entitled Stericycle to raise a customer's rates in only two circumstances: (i) to account for operational changes the Company implemented to comply with changes in the law; and (ii) to cover increase costs borne by the Company.  These contracts would automatically renew upon their expiration unless the customer provided sixty days written notice of termination before the renewal date.

46.     Stericycle enters into service contracts that specify the rate to be charged for disposal. Throughout the Relevant Period, however, Stericycle began to increase the fees on a routine, systematic, and fraudulent basis. The Company increased rates with ***no notice***, in order to meet revenue and growth projections. When customers noticed the rate increases, sought redress, or tried to cancel the contract, Stericycle would ignore the problem. In many cases, Stericycle threatened liquidated damages to these customers, if they cancelled their contracts, forcing many to accept new contract terms. Although these new terms may be lower than the currently overcharged rates, the new rates would still be higher than the terms set forth in the original contract. Stericycle defrauded thousands in this way, until the Company's business

practices were revealed, and over time, customers stopped doing business with Stericycle, damaging the Company's financial results.

47.     Stericycle's executives knew the automated price increases were wrong, because in 2006 they were urged by their own Vice President to reprogram the system in order to cease the practice with respect to federal governmental customers when several federal customers got wind of it.   But they continued the practice with regard to the vast majority of their SQ customers.   On information and belief, Stericycle continued its practice after it settled a qui tam case under the False Claims Act with the New York State Attorney General in 2012.   That case involved the same API policies at issue here, but the settlement was for New York governmental customers only.

48.     Stericycle executives continued the practice after recognizing seven years ago that it was wrong because of the tremendous revenue generated from automated price increases.   As an internal Stericycle e-mail states, "projected PI [Price Increase] revenue" was so big that it was separately tracked in "PI Impact analysis reports … sen[t] to Mark/Frank/Rich each month" – referring to Stericycle's three highest executives, CEO Miller, CFO ten Brink, and COO Kogler. The revenue stream from automated price increases was so great that Stericycle only modified its practice for government customers when forced to by a multi-state government investigation. It continued its API practice for SQ customers, who did not have the power of state and federal governments backing them up.

**B.     The Class Action**

49.     The Class Action alleged, on behalf of a Stericycle client, systematic, widespread and deliberate practice of raising pricing without any connection to increases in the costs or operational changes necessitated by changes in the law governing medical waste disposal.

50. The Class Action alleged that Stericycle imposed an automatic price increase of 18% during a calendar year on all Steri-Safe contract customers. Stericycle also imposed APIs on transactional customers whose prices were governed by agreements other than Stericycle's standard Steri-Safe contract, but whose terms also did not allow Stericycle to unilaterally raise prices through the imposition of APIs. On information and belief, none of these arbitrary price increases were tied to or justified by cost increases or operational changes implemented to comply with changes in the law.

51. The Class Action alleged that Stericycle trained its employees in both the "customer complaint" and "customer retention" departments to give fabricated reasons for the price increases in an attempt to convince customers to pay them. Stericycle instructed its customer retention employees to offer fake "price reductions" to get customers to pay as much of the API as possible. If a customer continued to object despite the false and misleading justifications offered for the API, Stericycle had a system in place to offer the customer "price reductions," which were in fact only reduced-price increases.

52. By 2006, Stericycle executives were aware that federal government customers objected to Stericycle's API policy. As a result, in September 2006, Stericycle Vice President Patrick Cott sent an e-mail to his subordinates directing them to stop charging APIs to federal government customers. While Stericycle understood that the terms of the Steri-Safe Service Agreement did not permit it to continue to charge APIs to the federal government, Stericycle continued to impose APIs on its small-quantity private sector customers.

53. Mr. Cott's e-mail disclosed the reason that Stericycle continued its API policy despite recognizing that it was unlawful: it generated a substantial revenue stream to Stericycle. Mr. Cott wrote to two subordinates: "Todd/Jerry – please be advised of the potential impact to

the PI Impact Analysis reports that Courtenay sends to Mark/Frank/Rich each month, as these accounts will no longer be in the mix for automated PIs and fuel charges, and thus you'll lose projected PI revenue with this change."

54.     The Class Action shows Stericycle's problems were widespread and recognized by management, however they continued to apply API's for years and report higher revenues. Stericycle's problems should have been recognized and addressed by management following the Class Action complaint, however Defendants allowed API practices to continue for years and downplayed the lawsuit, even after paying a $295 million settlement.

**C.     The *Qui Tam* Suit**

55.     After years of defrauding customers, a *qui tam* complaint was filed in April 2008 with an amended complaint filed in June 2010. The complaint alleged that Stericycle had defrauded the United States, 14 states, and the District of Columbia by imposing an automatic periodic price increase in violation of its contracts with the governmental entities.

56.     The *qui tam* amended complaint further alleges undisclosed price increases every 9 months to all SQ customers, including government customers.

57.     In January 2013, Stericycle settled this case with the Attorney General of the State of New York.  In the settlement agreement, Stericycle admitted that "[d]uring the period January 1, 2003 through September 30, 2012, with respect to New York Government Customers, Stericycle presented invoices containing automatic price increases not authorized by contracts viz. automatic periodic rate increases (automated price increases or "APIs"), that resulted in overpayment for products and services."

58.     The $2.4 million settlement between Stericycle and New York provides that Stericycle will reimburse New York for 100 percent of the charges resulting from automated

- 16 -

price increases. Stericycle was alleged to have overcharged nearly 1,000 New York governmental entities, including police and fire departments, rescue squads, schools, jails, and hospitals throughout the state. In addition, Stericycle agreed to pay treble damages to New York State as a result of the automated price increases.

59.     As part of the settlement with the New York Attorney General, Stericycle agreed to the following:

> a. Stericycle shall not, in the future, apply any APIs to New York Government Customers. Any APIs applied to and paid by New York Government Customers after the period of the covered conduct shall be credited to customer accounts.

> b. Stericycle shall provide New York Government Customers sixty-days' written notice of and the reasons for any proposed future rate increases directed to any such customer, and should that customer who receives such notice object to the pending increase, that customer shall be permitted to opt-out, without penalty, of all remaining contractual obligations, upon thirty-days' written notice to Stericycle.

> c. Nothing in this Agreement shall constitute a waiver of the rights of the State of New York to examine or re-examine the books and records of Stericycle to determine that no automated price increases have been applied to New York Government Customers.

60.     Significantly, the state and federal False Claims Act claims asserted in the qui tam action only sought relief on behalf of governmental agencies that were improperly overcharged. The New York Attorney General settlement did not provide relief for private entities. The complaint brought on behalf of the United States, the remaining 13 states, and the District of Columbia has since settled for $28.5 million.

61.     The *qui tam* suit further demonstrates management was aware of Stericycle's problems and ongoing lawsuits but chose to ignore and downplay them during the Relevant Period.

## D.     **Defendants' False and Misleading Statements**

62.     On February 7, 2013, Management caused Stericycle to release its financial results for the fourth quarter and full year of 2012 in a press release and on a conference call with investors and analysts.  In the press release, it was reported:

> Revenues for the full year 2012 were $1.91 billion, up 14.1% from $1.68 billion in 2011.  Acquisitions contributed approximately $140.3 million to the current year's growth in revenues.  Revenues increased 15.4% compared to the prior year when adjusted for unfavorable foreign exchange impacts of $21.8 million.  Gross profit was $857.3 million, up 12.7% from $760.7 million in 2011.  Gross profit as a percent of revenue was 44.8% compared with 45.4% in 2011.  Earnings per diluted share increased 14.6% to $3.08 in 2012 from $2.69 in 2011.  Non-GAAP earnings per diluted share, when adjusted for various items, increased 15.4% to $3.30 from $2.86.

63.     On the conference call, Management reported Stericycle's fourth quarter 2012 results as follows:

> Revenues were $503.6 million, up 12.8% from $446.6 million in Q4 of '12.  And internal growth, excluding returns and recall revenues, was up 8.4%.  Domestic revenues were $355.6 million, of which $332.7 million was domestic regulated waste and compliance services, and $22.8 million was recalls and returns. Domestic internal growth, excluding recalls and returns revenue, was up 10%, consisting of SQ up 11% and LQ up 9%.  International revenues were $148.1 million, and internal growth, adjusted for unfavorable exchange impact of $2.3 million, was up 5%.  Acquisitions contributed $31.1 million to the growth in the quarter.

> The gross profit was $227 million, or 45.1% of revenues.  SG&A expense, including amortization, was $95.6 million, or 19% of revenues.  Net interest expense was $13 million.  Net income attributable to Stericycle was $70.1 million, or $0.80 per share on an as reported basis, and $0.88 adjusted for acquisitions and other non-recurring expenses.

64.     Commenting on an investigation by the New York Attorney General into Stericycle's failure to follow customer contract terms, the Company's COO, Richard Kogler, interjected, "We disagreed with him."

65.     On February 28, 2013, Management caused Stericycle to file its Annual Report with the SEC on Form 10-K for the fiscal year ended December 31, 2012 (the "2012 10-K"), in

which it described in more detail the Company's financial results for 2012. In the 2012 10-K, Management explained that it targets SQ customers as a growth area because of the belief that these customers fear noncompliance with applicable regulations, which is "***the basis for the higher gross margins that we have achieved with our [SQ] customers relative to our [LQ] customers***." Management also made it a point to remind the market that one of its competitive strengths was its "Diverse Customer Base and Revenue and Cost Stability" since the Company is "***generally protected from the cost of regulatory changes or increases in fuel, insurance or other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these costs changes***."

66. Defendants Alutto, ten Brink, Miller, Schuler, Dammeyer, Hall, Lord, Patience, Zafirovski, Brown, and Spaeth signed the Form 10-K. Accompanying the Form 10-K were certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Alutto and ten Brink attesting to its accuracy and the adequacy of internal controls over financial reporting.

67. Defendant ten Brink spun customer churn as a non-issue on April 24, 2013 during a conference call:

> Really, we don't see a major difference in churn. We have a very good revenue retention, about 95%. And the rest of 5% leaves us some customers don't pay their bills. Obviously we stop service. There's doctors, dentists, [which] close their shops and retire, some consolidate. That's a 2%, and then your normal revenue, maybe 1% or 2%, is obviously it's a competitive market, and we lose some to competition.

68. Defendant Kogler discussed, during this conference call, the Consumer Class Actions, which were filed in connection with the systematic fraudulent billing practices alleged herein, reassuring investors that lawsuits were "without merit."

69. On February 5, 2014, after the markets closed, Management caused Stericycle to

release its financial results for the fourth quarter and full year of 2013. Again, a press release was issued and a conference call discussing the results was held. In the press release, Management reported the Company's full year 2013 results:

> Revenues for the full year 2013 were $2.14 billion, up 12.0% from $1.91 billion in 2012. Acquisitions contributed approximately $137.6 million to the current year's growth in revenues. Revenues increased 13.0% compared to the prior year when adjusted for unfavorable foreign exchange impacts of $19.0 million. Gross profit was $964.6 million, up 12.5% from $857.3 million in 2012. Gross profit as a percent of revenues was 45.0% compared with 44.8% in 2012. GAAP earnings per diluted share increased 15.7% to $3.56 from $3.08 in 2012. Non-GAAP earnings per diluted share, when adjusted for various items identified in the second of the following tables, increased 12.4% to $3.75 from $3.34.

70.     With respect to the Company's fourth quarter 2013 financial results, Management reported:

> Revenues were $567.9 million, up 12.8% from $503.6 million in the fourth quarter of 2012, and internal growth, excluding returns and recall revenues, was up 7.1%. Domestic revenues were $394.6 million, of which $368.2 million was domestic regulated waste and compliance services, and $26.4 million was recalls and returns. ***Domestic internal growth, excluding recalls and return revenues, was up 7.8%, consisting of SQ up 9% and LQ up 7%.***

> International revenues were $173.3 million, and internal growth adjusted for unfavorable exchange impact of $5.4 million, was up approximately 6%.

> Acquisitions contributed $32.4 million to the growth in the quarter.

> Gross profit was $253.3 million, or 44.6% of revenues. Adjusted for litigation settlements, gross profit was 45% of revenues.

> SG&A expense, including amortization, was $109.9 million, or 19.3% of revenues. Net interest expense was $15.3 million. Net income attributable to Stericycle was $78.2 million, or $0.90 per share, on an as-reported basis and $0.99 adjusted for acquisition and other nonrecurring expenses.

71.     In connection with this release, Defendant Alutto added that "the general business improved by about 13 basis points" and touted the Company's domestic growth:

> When you think about our latest quarter domestically, I would just characterize it that all of our growth engines performed really well in the quarter, especially

StrongPak. And I think that's why you saw us come back on the higher end of the range for both the SQ and LQ growth this quarter. We are always going to fluctuate. We've said that on the last several calls now. But certainly everything performed really, really well.

72. The Company's then Chief Financial Officer, Defendant ten Brink, further commented on Stericycle's SQ growth, adding:

Yes, so if you look at the small quantity generated 8% to 10% kind of guidance we give, roughly 40% to 50% of that growth comes from kind of price and volume in the market, and the remainder is really the additional services.

73. On February 28, 2014, Management caused the Company to file its Form 10-K for the year ended December 31, 2013 in which it described in more detail the Company's financial results for 2013. In this 10-K, Management explained *that Stericycle targets SQ customers as a growth area because they belief their fear of failing to comply with applicable regulation is "the basis for the higher gross margins that we have achieved with our [SQ] customers relative to our [LQ] customers."* In addition, Management claimed that one of the Company's competitive strengths was its "Diverse Customer Base and Revenue and Costs Stability" as the Company is "generally protected from the cost of regulatory changes or increases in fuel, insurance or other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these cost changes." Along those lines, Management assured investors and analysts that the Company had "been able to maintain high customer retention through excellent customer service" and "determined that our customer relationships have useful lives from 14 to 40 years based upon the type of customer, with a weighted average remaining useful life of 24.6 years."

74. Defendants Alutto, ten Brink Miller, Schuler, Dammeyer, Hall, Lord, Patience, Zafirovski, Brown, and Spaeth signed the Form 10-K. Accompanying the Form 10-K were certifications pursuant to SOX signed by Defendants Alutto and ten Brink attesting to its

accuracy and the adequacy of internal controls over financial reporting.

75.    Nearly a year later, after the market closed on February 5, 2015, Management caused Stericycle to release its financial results for the fourth quarter and full year of 2014 and host a conference call to discuss those results.  In the press release, Management caused the Company to report its full year 2014 results.  In relevant part:

> Revenues for the full year 2014 were $2.56 billion, up 19.3% from $2.14 billion in 2013.  Acquisitions contributed approximately $301.6 million to the current year's growth in revenues.  Revenues increased 20.8% compared with the prior period when adjusted for unfavorable foreign exchange impact of $33.6 million.  GAAP gross profit was $1.09 billion, up 13.5% from $964.6 million in 2013.  GAAP gross profit as a percent of revenues was 42.8% compared to 45.0% in 2013.  Non-GAAP gross profits as a percent of revenues was 42.9% compared to 45.1% in 2013.  GAAP earnings per diluted share increased 6.3% to $3.79 from $3.56 in 2013.  Non-GAAP earnings per diluted share, when adjusted for various items identified in the third of the following tables, increased 13.8% to $4.27 from $3.75.

76.    On the conference call, Defendant Ginnetti reported Stericycle's 2014 fourth quarter results as follows:

> Revenues were $676.9 million, up 19.2% from $567.9 million in Q4 2013.  And, internal growth, excluding returns and recall revenues, was up 8%.

> Domestic revenues were $479.7 million of which $462.7 million was domestic regulated waste and compliance services and $17 million was recalls and returns.  Domestic internal growth, excluding recalls and returns revenues was up 7.3% consisting of SQ up 8% and LQ up 7%.

> International revenues were $197.2 million.  And internal growth, adjusted for unfavorable foreign-exchange impact of $17 million, was up 10%.

> Acquisitions contributed $93.1 million to the growth in the quarter.  Gross profit was $285.4 million or 42.2% of revenues.  SG&A expense, including amortization, was $124.2 million or 18.3% of revenues.  Net interest expense was $18.1 million, net income attributable to Stericycle was $82.5 million or $0.96 per share on an as reported basis and $1.12 adjusted for acquisition related expenses and other adjusted items.
>                           *        *        *
> So, versus the prior quarter, gross margins were up 30 basis points.

77.     Newly appointed COO, Defendant Arnold, added, "We increased our regulated waste, operational infrastructure, enabling the continued growth of our retail and SQ regulated waste business."

78.     On March 2, 2015, Management caused the Company to file its Form 10-K for the year ended December 31, 2014 (the "2014 Annual Report") in which it described in more detail the Company's financial results for 2014.  In the 2014 Annual Report, Management caused the Company to claim that one of its competitive strengths was its "Strong Service Relationships with Customers" and tout its "Revenue and Cost Stability," reassuring investors and analysts that the Company is "***generally protected from the cost of regulatory changes or increases in fuel, insurance or other operating costs because [its] regulated waste contracts typically allow [it] to adjust [] prices to reflect these costs changes***."

79.     Moreover, according to the 2014 Annual Report, Stericycle targets SQ customers because their fear of failing to comply with applicable regulations is "the basis for the higher gross margins that [the Company has] achieved with [its] SQ customers relative to [its LQ] customers."  Management also caused Stericycle to state that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.8 years" and that it had "been able to maintain high customer retention through the quality of our customer service."  Finally, as part of the 2014 Annual Report, Management caused the Company to claim that it "operated in accordance with the terms of [its] customer contracts" and that class action complaints alleging otherwise were "without merit."

80.     Defendants Alutto, Ginnetti, Miller, Schuler, Dammeyer, Hall, Patience, Zafirovski, Chen, and Brown signed the Form 10-K. Accompanying the Form 10-K were

certifications pursuant to SOX signed by Defendants Alutto and Ginnetti attesting to its accuracy

and the adequacy of internal controls over financial reporting.

81.     On April 23, 2015, after the close of the financial markets, Management caused

the Company to release its financial results for the first quarter of 2015 and to host a conference

call discussing those results.  On the conference call, Defendant Ginnetti reported the Company's

earnings as follows:

> Revenues were $663.3 million, up 16.4% from $570 million in Q1 2014. Internal
> growth, excluding returns and recall revenues, was up 6.8%. Domestic revenues
> were $472.2 million, of which $452.3 million was domestic regulated waste and
> compliance services and $20 million was recalls and returns. Domestic internal
> growth, excluding recalls and returns revenues, was up 6.4%, consisting of SQ up
> 8% and LQ up 5%. International revenues were $191.1 million. And internal
> growth, adjusted for unfavorable foreign exchange impact of $23.1 million, was
> up 8%.
>
> Acquisitions contributed $86.3 million to the growth in the quarter. Gross profit
> was $281.3 million, or 42.4% of revenues. SG&A expense, including
> amortization, was $128.3 million, or 19.3% of revenues. Net interest expense was
> $18.6 million. Net income attributable to Stericycle was $75.5 million, or $0.87
> per share on an as reported basis, and $1.08 adjusted for acquisition-related
> expenses and other adjusted items.

82.     In the quarter, the Company missed its revenue guidance by $13.8 million.

Defendant Ginnetti dismissed the importance of the revenue miss by blaming it primarily on "the

extreme weather impact that we had and its impact on seasonality, as well as the lower energy

surcharges that we got in Q1."

83.     Seemingly unconcerned with the Company's missed guidance, Defendant Alutto

assured investors and analysts that the Company was still experiencing positive internal growth,

stating in part:

> I think when you look at the growth drivers for our SQ customer base in the US,
> there are several growth drivers that drive our organic internal growth.  SteriSafe
> is one of them, Communication Solutions, our hazardous waste, our
> Environmental Solutions business Brent talked about, the recently completed

integration of the PSC, really they all contribute. We continue to improve the SteriSafe offering, which gives us an ability to increase value for our customers and an opportunity to also accelerate revenue growth and profitability.

\* \* \*

No, I think if you look at the growth engines on the SQ side of the business, SteriSafe still provides a majority of the growth on the SQ business, and then ComSol, Communication Solutions and Environmental Solutions adds some additional growth there.

84. On June 1, 2015, while at the Stifel Investor Summit, Defendant ten Brink stated that Stericycle enjoyed 8% to 10% internal growth from SQ customers, with the price component of such growth being a little bit higher than CPL. Then, on July 16, 2015, during a conference call to discuss the Company's acquisition of Shred-it International, Inc. ("Shred-it"), Defendant Alutto compared the Company's business to Shred-it's, stating that both "have a similar and exciting growth pattern" and "[r]ecurring revenue and multi-year contracts [that] provide both businesses with a very predictable revenue and profit profile. SQ customers provide a stable and profitable customer base."

85. On July 23, 2015, Management caused the Company to report its financial results for the second quarter of 2015. After the market closed, Management hosted a conference all to discuss the Company's financials, which were reported as follows:

Revenues were $715.7 million, up 11.7% from $640.8 million in Q2 2014. Internal growth, excluding returns and recall revenues, was up 7.7%. Domestic revenues were $518.2 million, of which $489.9 million was domestic regulated waste and client services, and $28.3 million was recalls and returns. Domestic internal growth, excluding recalls and returns revenues, was up 6.6%, consisting of SQ up 8% and LQ up 5%.

International revenues were $197.5 million and internal growth adjusted for unfavorable foreign exchange impact of $27.3 million was up 10%. Acquisitions contributed $58.9 million to growth in the quarter. Gross profit was $305.3 million, or 42.7% of revenues. SG&A expense, including amortization, was $135.7 million, or 19% of revenues. Net interest expense was $16.4 million. Net income attributable to Stericycle was $60.5 million or $0.70 per share on an as-reported basis and $1.14 adjusted for acquisition-related expenses and other adjusted items.

\* \* \*

- 25 -

So we are very pleased with our third straight quarter-over-quarter increase in gross margin. Our increase over Q1 was 25 basis points. So, if you start with a Q1 gross margin of 42.4%, the returns on the recall business rebounded from the weather and seasonality, and that increased our margin by about 55 basis points.

86.     Defendant Alutto claimed "all of our lines of business continued to perform well and discussed the Company's purported growth, stating in relevant part:

SQ growth as we have stated in our guidance, is 8% to 10% growth. There really hasn't been a significant change to the contribution to those growth rates. Again, about 40% to 50% of that organic growth is related to price and volume, and then 50% to 60% of that, so the remainder of that growth is in the additional services, whether that's Steri-Safe hazardous-waste disposal, Communications Solutions, they all contribute to the SQ growth.

87.     Then, on September 8, 2015, Management caused Stericycle to file a registration statement on S-3 (the "Registration Statement") with the SEC in order to raise capital to fund the Company's acquisition of Shred-it.   The Registration Statement was supplemented by a preliminary prospectus supplement filed with the SEC on September 9, 2015 (the "Preliminary Prospectus"), a pricing term sheet filed with the SEC on September 10, 2015 (the "Pricing Term Sheet"), and a prospectus supplement filed with the SEC on September 11, 2015 (the "Prospectus" and together with the Registration Statement, the Preliminary Prospectus and the Pricing Term Sheet, the "Offering Materials").  Eventually, Stericycle sold 7,700,000 depository shares in the Offering for net proceeds of approximately $746.9 million.

88.     In the Prospectus, Management caused the Company to claim that one of its competitive advantages was its "Strong Service Relationships with Customers," touting also its "Revenue and Cost Stability" as the Company is "generally protected from the cost of regulatory changes or increases in fuel, insurance, or other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these cost changes."  The Prospectus also contained a summary of the Company's financial results for the six months ended June 30,

2015, including revenues of nearly $1.4 billion and undiluted EPS of $1.60. In addition, the Prospectus incorporated by reference the Company's Form 10-K for the year ended December 31, 2014 and the quarters ended March 31, 2015 and June 30, 2015. The Registration Statement was signed by Management.

89.     On October 22, 2015 Management caused the Company to report lower than expected growth rates and revenues for the third quarter 2015, suggesting, in part, that they both were unfavorably impacted by lower hazardous waste volumes from the Company's industrial customers, Management stated that it expected lower hazardous waste volumes to continue in the short term, thus lowering the mid-point of their mid-term domestic internal growth rates by 1%. In addition, Management caused the Company to lower its 2015 adjusted and cash EPS guidance by 5.7% and 4.3% respectively, while also issuing 2016 guidance that was below analyst expectations.

90.     Rather than disclose the true extent of the Company's problems and the underlying reasons behind the disappointing results—namely, customer attrition resulting from Management's fraudulent billing practices—Defendant Arnold attempted to reassure investors that, while the Company had not performed as expected, it was still experiencing positive growth:

> In the quarter we experienced solid growth in selling additional services to our existing customer base. This growth came from retail hazardous waste, sharp management, pharmaceutical waste, and communications solutions. For example, we are seeing increased adoption of our pharmaceutical waste service by physician practices. By utilizing our existing customer relationships along with our environmental solutions infrastructure, we are able to deliver a simple and cost-effective service that keeps our customers compliant and helps protect the environment.

91.     Defendant Alutto maintained that the decline in industrial waste volumes in Q3 2015 was due ***"to the drop in energy and commodity prices."***

- 27 -

92.     On this news, the price of Stericycle's common stock dropped significantly from $149.04 per share on October 22, 2015 to $120.31 the next day, a decline of over 19%. This represented total market capitalization loss of over $2.4 billion. Moreover, the trading price of Stericycle's depository shares fell from $106.34 per share to $92.56, a decline of 13% and an aggregate loss of over $106 million.

93.     On February 4, 2016, after the markets closed, Management caused Stericycle to release its financial results for the fourth quarter and full year of 2015 in a press release and held a conference call to discuss those results. In the press release, full year 2015 results were reported as follows:

> Revenues were $833.3 million, up 31.2% from $676.9 million in Q4 2014, and internal growth, excluding returns and recall revenues, was up 5.2%. Domestic revenues were $651.1 million, of which $626.8 million was domestic regulated waste and compliance services and $24.3 million was recalls and returns.

> Fourth quarter domestic internal growth, excluding returns and recalls revenues, was up 4%, consisting of SQ up 6% and LQ up 2%. As anticipated, growth rates were impacted by lower fuel surcharges and lower hazardous waste volumes from our industrial customers.

> International revenues were $237.2 million, and internal growth adjusted for unfavorable foreign exchange impact of $26.9 million was up 8.1%. This growth rate was also impacted by lower hazardous waste volume. Acquisitions contributed $200 million to growth in the quarter. Gross profit was $380.4 million, or 42.8% of revenues. SG&A expense, including amortization, was $203.6 million, or 22.9% of revenues. Net interest expense was $24.9 million. Net income attributable to Stericycle was $78.9 million, or $0.80 per share on an as-reported basis, and $1.11 when adjusted for acquisition related expenses and other adjustments.

94.     Defendant Alutto maintained, "Overall, our business performed very well in the quarter and remains on track despite foreign-exchange headwinds and lower hazardous waste volume from our industrial customers."

95.     In addition, Management caused the Company to announce that it agreed to pay

$28.5 million to settle whistleblower claims stemming from allegations of increased prices for government customers.

96.    On April 28, 2016, Stericycle issued a press release announcing the financial results for the first quarter of Fiscal 2016. In the conference call held that day to discuss the financial result, the Company announced that its first quarter 2016 results fell below the Company's guidance and analyst expectations. Stericycle reported $1.11 in adjusted EPS, below the Company's guidance of $1.17 and the analyst consensus estimate of $1.14. Stericycle lowered its 2016 adjusted EPS guidance to $4.90-$5.05, from $5.26-$5.33.

97.    The Defendants tried to reassure analysts and investors that Stericycle was nonetheless still performing well. Defendant Alutto stated, "[W]e experienced strong revenue growth, strong cash flow, and solid sequential growth for the Shred-it acquisition." Defendant Arnold added, "In our retail and healthcare hazardous waste compliance programs, we continue to experience strong growth."

98.    As a result of this news, on April 28, 2016, the Company's stock price plunged from $121.74 per share to $95.56, a decline of 21.5%. The trading price of Stericycle's depositary shares also fell from $91.76 per share to $77.66, a decline of 15.4% and an aggregate market capitalization loss of over $108 million.

99.    The statements set forth above were materially false and misleading and/or failed to disclose that: (1) the Company unilaterally and without notice deliberately increased the billing rates of SQ customers in violation of the service contracts entered into between the Company and these customers; (2) the Defendants were aware that the Company was deliberately violating customer contracts; (3) the Company was not providing excellent customer service as proclaimed in Stericycle's public filings but, in fact, was subjecting customers to

abusive business practices; (4) the Company's poor customer service significantly lessened the useful life of customer relationships; and (5) Stericycle's billing practices of SQ customers was the generator of gross margins the Company claimed to have achieved throughout the Relevant Period.

E. **The Truth Begins to Emerge**

100. Just three months later, Management caused the Company to announce in a conference call discussing the Company's financial results for the second quarter of 2016 that growth in both its core and non-core businesses decelerated. In addition, Management, once again, caused the Company to lower its 2016 EPS guidance to $4.68 - $4.75 per share from $4.90 - $5.05 per share. Ginnetti then reported the Company's second quarter 2016 results as follows:

> Global revenues were $891.6 million, up 24.6% from $715.7 million in Q2, 2015. And internal growth, excluding the impact of foreign-exchange acquisitions and manufacturing and industrial services, was up 3.3%. Domestic revenues were $651.1 million. Excluding the impact of acquisitions and manufacturing and industrial's revenues, internal growth was at 2.3%.

> For consistency of your models we will continue to report the following for the remainder of the year. Domestic regulated waste and compliance service revenues was $486.1 million, up 1%, SQ was up 2%, LQ was up 1%. Growth rates were impacted by lower fuel surcharges and lower manufacturing and industrial waste revenues. Recalls and returns revenues was $20.9 million. International revenues were $234.5 million, excluding the impact of foreign-exchange, acquisitions, and manufacturing and industrial services internal growth was 5.8%.

> Acquisitions contributed $185.9 million to growth in the quarter. Gross profit was $381.6 million, or 42.8% of revenues. SG&A expense, excluding amortization, was $189.5 million, or 21.3% of revenues. Net interest expense was $24.4 million. Net income attributable to Stericycle was $37.3 million, or $0.43 per share on an as-reported basis, and $1.18 when adjusted for acquisition-related expenses and other adjustments.

101. Alutto blamed these results and the cut in guidance partially on "increased

pricing pressure on our SQ customer base" and also stated that the same issues that affected the Company in the second quarter of 2016 would likely result in 2017 growth rates below Stericycle's historical average.

102.    Despite Management's attempts to quash investor concerns, Stericycle's stock fell once against after the July 28, 2016 disclosures from $105.93 per share to $90.27, a decline of 14.8%.  This represented a total market capitalization loss of over $1.3 billion.  Moreover, the trading price of Stericycle's depository shares fell from $84.72 per share to $74.59 per share, representing a decline of 12% and an aggregate loss of over $78 million.

## INSIDER SELLING

103.    While in possession of non-public adverse information regarding Stericycle's automated pricing systems, the Insider Selling Defendants took full advantage of the artificial inflation of Stericycle's stock price caused by the Defendants' misrepresentations and omissions. During the Relevant Period, the Insider Selling Defendants sold a combined 986,418 shares of common stock for proceeds greater than ***$114 million.***

104.    Specifically, Insider Selling Defendants made the following sales of Stericycle stock on the following dates during the Relevant Period, and reaped the following proceeds from these sales:

| Defendant | Transaction Dates | Shares Sold | Price per Share | Total Value |
|---|---|---|---|---|
| Alutto | 4/26/2013 | 13,500 | $107.95 | $1,457,325.00 |
| | 4/26/2013 | 500 | $107.95 | $53,975.00 |
| | 8/18/2014 | 8,162 | $119.29 | $973,644.98 |
| | 8/19/2014 | 6,000 | $119.38 | $716,280.00 |
| | 8/19/2014 | 2,338 | $119.38 | $279,110.44 |
| | 2/12/2015 | 9,000 | $132.02 | $1,188,180.00 |
| **Totals** | | **39,500** | | **$4,668,515.42** |

| Defendant | Transaction Dates | Shares Sold | Price per Share | Total Value |
|---|---|---|---|---|
| ten Brink | 2/13/2013 | 11,022 | $96.51 | $1,063,733.22 |
| | 2/14/2013 | 3,978 | $96.55 | $384,075.90 |
| | 4/26/2013 | 18,408 | $108.21 | $1,991,929.68 |
| | 4/26/2013 | 8,141 | $108.21 | $880,937.61 |
| | 4/26/2013 | 3,451 | $108.21 | $373,432.71 |
| | 8/1/2013 | 38,259 | $116.34 | $4,451,052.06 |
| | 8/1/2013 | 7,500 | $116.40 | $873,000.00 |
| | 8/1/2013 | 100 | $116.34 | $11,634.00 |
| | 10/28/2013 | 139 | $117.02 | $16,265.78 |
| | 11/1/2013 | 4,579 | $116.89 | $535,239.31 |
| | 11/1/2013 | 1,100 | $116.89 | $128,579.00 |
| | 11/4/2013 | 12,595 | $116.58 | $1,468,325.10 |
| | 11/5/2013 | 11,587 | $116.48 | $1,349,653.76 |
| | 2/11/2014 | 3,027 | $116.08 | $351,374.16 |
| | 2/12/2014 | 6,438 | $116.02 | $746,936.76 |
| | 2/12/2014 | 737 | $116.02 | $85,506.74 |
| | 2/13/2014 | 5,574 | $116.19 | $647,643.06 |
| | 2/13/2014 | 4,220 | $116.19 | $490,321.80 |
| | 2/14/2014 | 6,780 | $116.17 | $787,632.60 |
| | 4/29/2014 | 23,766 | $116.08 | $2,758,757.28 |
| | 4/30/2014 | 6,234 | $116.14 | $724,016.76 |
| | 7/29/2014 | 30,000 | $118.84 | $3,565,200.00 |
| | 7/29/2014 | 15,000 | $118.84 | $1,782,600.00 |
| **Total** | | **222,635** | | **$25,467,847.29** |

| Defendant | Transaction Dates | Shares Sold | Price per Share | Total Value |
|---|---|---|---|---|
| Ginnetti | 10/31/2014 | 5,000 | $125.05 | $625,250.00 |
| | 2/17/2015 | 5,000 | $132.86 | $664,300.00 |
| | 7/29/2015 | 5,000 | $139.81 | $699,050.00 |
| | 2/19/2016 | 6,924 | $110.36 | $764,132.64 |
| | 2/19/2016 | 1,076 | $110.88 | $119,306.88 |
| | 2/19/2016 | 5,684 | $110.88 | $630,241.92 |
| | 2/19/2016 | 3,500 | $110.88 | $388,080.00 |
| **Total** | | **32,184** | | **$3,890,361.44** |

| Defendant | Transaction Dates | Shares Sold | Price per Share | Total Value |
|---|---|---|---|---|
| Miller | 2/8/2013 | 20,000 | $97.60 | $1,952,000.00 |
| | 3/5/2013 | 20,000 | $98.13 | $1,962,600.00 |
| | 4/30/2013 | 100,000 | $108.14 | $10,814,000.00 |
| | 8/13/2013 | 28,088 | $117.14 | $3,290,228.32 |
| | 11/14/2013 | 13,000 | $117.50 | $1,527,500.00 |
| | 12/10/2013 | 52,538 | $115.68 | $6,077,595.84 |
| | 10/27/2014 | 40,000 | $122.61 | $4,904,400.00 |
| | 12/19/2014 | 10,335 | $132.62 | $1,370,627.70 |
| Total | | 283,961 | | $31,898,951.86 |

| Defendant | Transaction Dates | Shares Sold | Price per Share | Total Value |
|---|---|---|---|---|
| Schuler | 3/25/2013 | 1,880 | $103.93 | $195,388.40 |
| | 6/13/2013 | 1,892 | $105.75 | $200,079.00 |
| | 12/20/2013 | 6,452 | $96.40 | $621,972.80 |
| Total | | 10,224 | | $1,017,440.20 |

| Defendant | Transaction Dates | Shares Sold | Price per Share | Total Value |
|---|---|---|---|---|
| Dammeyer | 8/2/2013 | 4,110 | $116.73 | $479,760.30 |
| | 2/13/2014 | 20,000 | $115.75 | $2,315,000.00 |
| | 11/4/2014 | 9,142 | $125.97 | $1,151,617.74 |
| | 12/30/2014 | 9,500 | $132.60 | $1,259,700.00 |
| | 8/6/2015 | 9,000 | $142.66 | $1,283,940.00 |
| | 8/18/2015 | 8,500 | $147.44 | $1,253,240.00 |
| Total | | 60,252 | | $7,743,258.04 |

| Defendant | Transaction Dates | Shares Sold | Price per Share | Total Value |
|---|---|---|---|---|
| Hall | 7/30/2013 | 12,529 | $115.62 | $1,448,602.98 |
| | 6/10/2014 | 16,466 | $115.69 | $1,904,951.54 |
| Total | | 28,995 | | $3,353,554.52 |

| Defendant | Transaction Dates | Shares Sold | Price per Share | Total Value |
|---|---|---|---|---|
| Lord | 6/28/2013 | 6,040 | $110.00 | $664,400.00 |
| **Total** | | **6,040** | | **$664,400.00** |

| Defendant | Transaction Dates | Shares Sold | Price per Share | Total Value |
|---|---|---|---|---|
| Patience | 6/7/2013 | 45,500 | $108.20 | $4,923,100.00 |
| | 12/10/2014 | 65,124 | $130.75 | $8,514,963.00 |
| **Total** | | **110,624** | | **$13,438,063.00** |

| Defendant | Transaction Dates | Shares Sold | Price per Share | Total Value |
|---|---|---|---|---|
| Spaeth | 7/30/2013 | 4,000 | $115.52 | $462,080.00 |
| **Total** | | **4,000** | | **$462,080.00** |

| Defendant | Transaction Dates | Shares Sold | Price per Share | Total Value |
|---|---|---|---|---|
| Kogler | 2/13/2013 | 11,600 | $96.52 | $1,119,632.00 |
| | 2/14/2013 | 8,400 | $95.55 | $802,620.00 |
| | 4/26/2013 | 30,000 | $108.21 | $3,246,300.00 |
| | 7/29/2013 | 22,560 | $116.04 | $2,617,862.40 |
| | 7/30/2013 | 4,718 | $115.86 | $546,627.48 |
| | 7/30/2013 | 2,241 | $115.86 | $259,642.26 |
| | 7/30/2013 | 481 | $115.86 | $55,728.66 |
| | 8/1/2013 | 5,000 | $116.57 | $582,850.00 |
| | 10/28/2013 | 68 | $117.02 | $7,957.36 |
| | 11/1/2013 | 2,798 | $116.81 | $326,834.38 |
| | 11/4/2013 | 3,772 | $116.58 | $439,739.76 |
| | 11/4/2013 | 2,432 | $116.58 | $283,522.56 |
| | 11/5/2013 | 5,430 | $116.48 | $632,486.40 |
| | 2/11/2014 | 2,851 | $116.08 | $330,944.08 |
| | 2/12/2014 | 6,614 | $116.02 | $767,356.28 |
| | 2/12/2014 | 143 | $116.02 | $16,590.86 |
| | 2/13/2014 | 9,223 | $116.19 | $1,071,620.37 |
| | 2/14/2014 | 5,634 | $116.17 | $654,501.78 |

|  | 2/14/2014 | 101 | $116.17 | $11,733.17 |
|---|---|---|---|---|
|  | 4/30/2014 | 8,750 | $116.12 | $1,016,050.00 |
|  | 7/29/2014 | 15,000 | $119.35 | $1,790,250.00 |
|  | 10/27/2014 | 6,010 | $123.09 | $739,770.90 |
|  | 10/27/2014 | 4,090 | $123.09 | $503,438.10 |
|  | 10/27/2014 | 2,400 | $123.09 | $295,416.00 |
|  | 10/28/2014 | 12,500 | $123.91 | $1,548,875.00 |
|  | 10/28/2014 | 1,437 | $123.80 | $177,900.60 |
| **Total** |  | **174,253** |  | **$19,846,250.40** |

| Defendant | Transaction Dates | Shares Sold | Price per Share | Total Value |
|---|---|---|---|---|
| Arnold | 10/27/2014 | 3,000 | $123.06 | $369,180.00 |
|  | 10/30/2014 | 1,750 | $123.61 | $216,317.50 |
|  | 2/17/2015 | 4,000 | $132.91 | $531,640.00 |
|  | 7/30/2015 | 5,000 | $139.30 | $696,500.00 |
| **Total** |  | **13,750** |  | **$1,813,637.50** |

105.    Insider Selling Defendants Relevant Period stock sales were suspicious in timing because these sales were made while in possession of material, non-public adverse information that Stericycle's growth was due to unlawful rate increases, and that due to these rate increases, customers were leaving Stericycle in large numbers.

106.    During the Relevant Period, the Insider Selling Defendants made no purchases of Stericycle shares on the open market.

### DERIVATIVE AND DEMAND ALLEGATIONS

107.    Plaintiff brings this action derivatively in the right and for the benefit of Stericycle to redress the breaches of fiduciary duty and other violations of law by Defendants.

108.    Plaintiff is, and at all relevant times has been, a Stericycle shareholder. Plaintiff will adequately and fairly represent the interests of Stericycle and its shareholders in enforcing and prosecuting its rights.

109.    In light of these events described herein, and in accordance with Delaware law, on

October 14, 2016, Plaintiff sent the Demand to Miller, Stericycle's current Chairman if the Board, demanding that Stericycle's Board investigate and take legal action against those responsible for the damages the Company has suffered and is certain to suffer.

110.    On February 23, 2017, Plaintiff received the February 23 Letter. The February 23 Letter also stated that the Company had retained Foley as independent counsel to assist with investigations concerning the Demand. A true and correct copy of the February 23 Letter is attached hereto as Exhibit A.

111.    On April 4, 2018, Plaintiff received correspondence from House representing Foley, regarding the outcome of the investigation conducted concerning the Demand. Therein, Foley informed Plaintiff of the following:

> After an extensive inquiry, the Committee has completed its review of the matters raised in the Demand Letter and reported its findings and recommendations to the Board. As described below, based on the Committee's work, the Board has accepted the Committee's recommendation and unanimously resolved that it is not in the Company's best interests to commence a civil action against any of the Company's current or former officers, directors, or employees as demanded in the Demand Letter.

A true and correct copy of the Refusal is attached hereto as Exhibit B.

112.    The Refusal is most notable for what it omits rather than what it contains. The Refusal details the following rationale for refusing the Demand; including the potential costs of litigation and the obligations to advance defense costs for the defendants during the litigation, the potential distraction to management, negative publicity, and the impact on employee morale and customer relationships.

113.    However, the Refusal cannot reconcile these concerns with the settlements in the Government Action and Securities Action, totaling over $300 million, which the Refusal conveniently fails to identify, despite their apparent concern of litigation costs.

114. In light of the foregoing, the Board's refusal is improper, demonstrating the Board's lack of good faith, and confirming that Plaintiff should be allowed to proceed and to prosecute this action derivatively on behalf of the Company.

115. Stericycle is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

## COUNT I

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCAIARY DUTY

116. Plaintiff incorporates by reference all preceding and subsequent paragraphs as it fully set forth herein.

117. As alleged in detail herein, each of the Defendants had a duty to ensure that Stericycle disseminated accurate, truthful and complete information to its shareholders.

118. Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Stericycle shareholders materially misleading and inaccurate information through, *inter alia,* SEC filings and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgement.

119. As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's automated pricing systems were maintained in good faith, and, when put on notice of problems with the Company's business practices and operations by customers, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

120. Defendants willfully ignored the obvious and pervasive problems with Stericycle's internal controls practices and procedures and failed to make a good faith effort to

correct the problems or prevent their recurrence.

121.    Defendants misconduct alleged herein constituted an abuse of their ability to control and influence Stericycle, for which they are legally responsible. In particular, Defendants abused their positions of authority by causing or allowing Stericycle to misrepresent material facts regarding its financial conduct and business prospects.

122.    Defendants had a duty to Stericycle and its shareholders to prudently supervise, manage, and control the operations, business and internal financial accounting, and disclosure of Stericycle.

123.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Stericycle in a manner consistent with the duties imposed upon them by the law. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence, and candor in the management and administration of Stericycle's affairs and in the use and preservation of Stericycle's assets.

124.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II

## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

125.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as it fully set forth herein.

126.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Stericycle.

127.    Plaintiff, as a shareholder and representative of Stericycle, seeks restitution from

these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

128.    As a direct and proximate result of Defendants' foregoing unjust enrichment, the Company has suffered significant damages, as alleged herein.

## COUNT III

### AGAINST THE INSIDER SELLING DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR INSIDER SELLING

129.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.    At the time of the stock sales set forth herein, Insider Selling Defendants knew, but did not disclose publicly, the proprietary non-public and material information described herein, and made stock sales described herein on the basis of and because of their knowledge of this proprietary and material information.

131.    The information described above was proprietary non-public information concerning the Company's financial conduct and future business prospects. It was a proprietary asset belonging to the Company, which Insider Selling Defendants used for their own benefit when they sold Stericycle stock.

132.    Plaintiff, as a shareholder of Stericycle, seeks restitution from these Defendants.

133.    As a result of Insider Selling Defendants insider trading, Stericycle has been injured and is entitled to damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.       Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.       Directing Stericycle to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board

C.       Awarding to Stericycle restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.       Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.       Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  July 30, 2018

/s/ Lori A. Fanning
Marvin A. Miller
Lori A. Fanning
**MILLER LAW LLC**
115 South LaSalle Street
Suite 2910
Chicago, IL 60603
Telephone: (312) 332-3400
MMiller@millerlawllc.com
LFanning@millerlawllc.com

Robert B. Weiser
Brett D. Stecker
James M. Ficaro
**THE WEISER LAW FIRM, P.C.**
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 408-8062
rw@weiserlawfirm.com
bds@weiserlawfirm.com
jmf@weiserlawfirm.com

Frank J. Johnson
**JOHNSON FISTEL, LLP**
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
Email: frankj@johnsonfistel.com

Michael I. Fistel, Jr.
**JOHNSON FISTEL, LLP**
Murray House
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
Email: michaelf@johnsonfistel.com

*Attorneys for Plaintiff*